May it please the Court, Counsel, my name is Guy Dutour and I represent the Respondent Appellant M.J. Corboy Construction and the Illinois Insurance Guarantee Fund. In summary with the facts, this case was tried in 1998. The Commission found that as a result of working through repetitive trauma, the petitioner sustained right lateral epicondylitis, that matter is a final decision, and awarded benefits in 1997. The petitioner continued to treat and was released to full duty work in June of 1997, doing her pre-accident plumbing work. She treated with Dr. Michelle Glasgow. In 2000, Dr. Glasgow became ill and then the petitioner was treating with her husband, Dr. Stephen Glasgow, and Dr. Leah Kiss at the same facility. On January 23, 2001, Dr. Stephen Glasgow said, I find the petitioner to be at maximum medical improvement and she should press on. After that, the petitioner did continue to receive treatment, that's undisputed, and then in December of 2003, she was taken off work, eventually underwent a second surgery, and then on March 1, 2005, was given permanent work restrictions. Now this case is going to turn on your argument that the claimant reached MMI on January 23, 2001, correct? Correct. As opposed to the March 1, 2005 MMI date found by the commission. And you're basing that on the opinion of S. Glasgow? S. Glasgow and M. Glasgow as well in her deposition. Okay. And a few other factors as well. Why was the claimant seeing Dr. Leah Kiss less than seven months after S. Glasgow rendered his opinion? I know Dr. Leah Kiss was at the same facility as S. Glasgow, so I don't know if it was just a matter of who was there that day, but I don't know why specifically why S. Glasgow was not the only one rendering treatment when M. Glasgow was out on due to illness. Why was he getting treatment at all? Why was the petitioner getting treatment? Yeah. After the opinion of MMI. Because there was... What was the treatment for? What was the treatment for? The right lateral epicondylitis. So he was being treated medically for the injury that he suffered at work? Yes. So how could he have possibly reached medical improvement if he was still being treated? That's what I was trying to, when I was doing the research, figure this out myself. And what did you figure out? What I figured out was the following. Going through the case law and establishing maximum medical improvement, obviously the court looks to four factors that you are all aware of. Return to work, medical testimony concerning the injury, the extended injury. And the court said, most importantly, whether the injury is stabilized. So I looked at those four factors to determine did the commission get this wrong? Obviously, as we said, the petitioner returned to work full duty in June of 97. She was no longer working for our client, but doing the same work of approximately 34 employers through the union. Next, as you know, Dr. Stephen Glasgow said the petitioner was at MMI in January 2001. Of course, treatment did continue on after that. There's no gap in treatment. So the question, like you said, is did she really reach maximum medical improvement at that time? As you know, you can reach maximum medical improvement and still require care when petitioners try their cases and their medical rights remain open under Section 8A. Petitioners reach MMI, but the respondent could still be liable for future medical benefits. But most of the time, that's not, those aren't medical, that's not medical treatment to cure the underlying condition. It's medical treatment to relieve the pain and suffering caused by the underlying treatment. So you're, they're never going to cure the condition, but they're going to send you to a pain clinic so that you can live with the pain that you get from the condition. So you're still getting medical treatment, even though you've reached maximum medical improvement. You're never going to improve the condition. That's why I asked the question, what was she being treated for? Oh, the lateral epicondylitis. And at her deposition, they asked, the respondent asked Dr. Michelle Glasgow, do you agree with your husband's assessment on January 23, 2001? And she said, in her opinion, when you can no longer receive any significant improvement, that's when you've reached maximum medical improvement. And she said to that extent, she agreed with her husband's assessment. So that's what her opinion was on this. Because the commission states that, you know, Dr. Stephen Glasgow gave this opinion, but he only saw her the two times, obviously. And the commission also stated Dr. Michelle Glasgow and Dr. Leakis never, or they said that they opined that she was not at MMI. I went through Dr. Leakis's records, Dr. Michelle Glasgow's records. They never said we do not find her to be at MMI, but they did recommend continued care as well. So I'm going off the treating physician, Dr. Michelle Glasgow's opinion that in January of 2001, based on what her husband said, yeah, she's going to need continued treatment, but she has improved as good as she can be. That's what Michelle Glasgow said. And the petitioner obviously, according to Dr. Stephen Glasgow, should press on, work, and may need care down the line. And that's what she did. She continued working, doing the same jobs for other employers that the commission found initially, the repetitive trauma that caused her initial injury. They said, you know, they found that that wasn't a new injury, and they were knowing there was no new trauma as a result of this. So they were saying. After January 2001, the claimants treating physicians continued to provide care, including injections, physical therapy. Couldn't the commission therefore infer based on that she didn't reach MMI? Why isn't that a reasonable inference to draw? Oh, the fact that they were recommending more care, why can't they infer that she wasn't at MMI at the time? Well, injections, therapy, care, yes. Why would that support their decision? Because I think it was conceded that, you know, she had a surgery before the January of 2001 MMI date. In 1999, Dr. Glasgow said she's going to need treatment down the line for this, almost like insinuating that she's not going to ever be, like she's just going to need treatment down the line. But Dr. M. and S. Glasgow both felt that she just maximized, that she wasn't going to get much better. So it was more like the injections were just to, she was going to keep having pain, especially doing her pre-accident job for other companies. This was going to cause continued pain. Why isn't that within the province of the commission to weigh the weight of the evidence? It is obviously in the province of the commission to weigh the evidence. I just think, based on what, the fact that Dr. Michelle and Stephen Glasgow felt she was at MMI at that time, and even though there was continued care, you could, I understand what Justice Hoffman is saying, but you could still get medical care after being at MMI. I just think the commission, their conclusion was, it was just the opposite conclusion here. Because the doctor said that, and they were saying that these doctors never said that they opined that she was not at MMI, but that wasn't the case here. Let me ask you a question. Assume for a moment that an injured petitioner reaches MMI, but is still getting continued treatment, medical treatment for pain or symptoms. Why isn't the cost of that subsequent treatment compensable? Doesn't the act specifically say that you have to pay all medical bills related to the injury? It doesn't say before MMI. MMI usually is just the cutoff for TTD. Right. I think the only way a respondent could argue that you're not liable for those bills is there would have to be a new accident. Intervening act. There's no intervening act here, is there? I think my argument for the intervening act here is, they said there was no new injury, no new trauma, and when they did the second surgery, they said there was more degeneration at the same site prior to the January of 01 MMI date. But I would submit that the new injury was she kept working, doing repetitive trauma. She worked for six years full duty doing the same repetitive trauma that necessitated the need for a second surgery, and therefore that's what I think the repetitive trauma was the new injury. Unfortunately, I don't have any case law. Let me follow that for a minute. Okay. Isn't that true of any repetitive trauma case? You know, I am able to identify some injury, carpal tunnel, whatever it is, that's caused by repetitive trauma. I'm able to identify it because a doctor has now told me you have carpal tunnel and it's because of your work. But I continue to work. And so if I continue to work, I'm repeating the trauma. The argument could then be made I'm not entitled to any medical after I go back to work, and that's certainly not the case. We don't punish somebody because they continue to work with pain. Oh, right. So my question is in this particular case, you've got an issue in this appeal that says that the commission erred by awarding medical bills for treatment administered after the MMI date that you fix in January. And my question is, what's the intervening act that cut off the causal connection between the repetitive trauma that was originally identified that nobody really disputes and the medical treatment rendered after January? The only intervening act that I could submit is that it was repetitive trauma for new employers doing the same thing. That would be the only new, that would be the, there was no acute traumatic specific incident. It was just the repetitive trauma that she kept doing that the commission felt caused the initial injury back in 1994. That would be the only new intervening accident. Counsel, you'll have time on rebuttal. Thank you. Counsel, please. May it please the court, Mark Matranga for the petitioner Sandra Williams-Woods. Counsel, the way this issue has been framed by the appellant, the key issue is the issue of whether or not the claimant reached MMI on January 23rd, 2001. So can you focus in and delineate why it is that the claimant did not reach MMI on January 23rd, 2001? What evidence supports that? The evidence which supports that, Your Honor, is medical treatment, complaints, symptomatic findings, treatment and comments from the treating physicians over a long period of time, commencing October 94, up to and past January 2001, which reflected unremitting symptoms and complaints of pain. That's the finding of the arbitrator and the finding of the commission. There's nothing in this record to suggest otherwise. Three little words. They may spell for some I love you, but here, maximum medical improvement. Three little words. Without those three little words, we wouldn't even be here. I can assure you, Your Honor, there's more abuse committed under those three little words in workers' comp litigation than any other, because we get the same argument. Because they're at MMI, the petitioner's at MMI, no more medical treatment, no more lost time, no permanency, perhaps. Why do they make the argument no more medical treatment? That's an argument I've never understood. The app doesn't provide that. They don't say no more TTP. I mean, they've got a Supreme Court case that says that. No TTP after MMI. Of course, there can be maintenance. There can be maintenance, which is the same amount of money. Right. And in this particular case, just as an aside, Ms. Woods was disabled from working by her doctor's statement thereafter. In other words, she never reached the point where her condition had stabilized. That's the main factor that counsel mentions. She never really had stabilized so that she needed more treatment. Again, this isn't some kind of fade to black where we go from 1994 to 2001. In 1999 or 1998, unfortunately, I would fail a test on the facts of all the medical treatment she had. But in several years before January 2001, Dr. Glasgow said she's going to need another surgery eventually for this. So this is on a continuum, what we have here. And the real issue is not whether MMI was reached or not, but whether or not the finding made by the commission, the petitioner's present condition of ill-being at the time of the second arbitration hearing in 2006, was causally connected to the October 1994 incident. And it was found to be causally connected because Dr. Wehner, Dr. Lieber, two Section 12 evaluators for respondent, found the condition of ill-being that was discovered, which manifested itself due to petitioner's work in October 1994, was a causative factor. Dr. Cole, who examined on behalf of petitioner, found there to be a causative factor. Dr. Sharon Glasgow, notwithstanding what we've heard here, found a causal connection, and I'll point to that very simply very soon. Dr. Lakos said in 2001 that she wasn't at MMI. Dr. Lakos, in fact, said she should consider changing jobs. That was in 2000. She'd seen Dr. Lakos because Lakos was a partner with the Glasgow husband and wife team. In August of 2000, Dr. Lakos said she should change jobs. So we see here these events existing on a continuum. I can understand any employer's concern and the arguments they make about we get, quote, stuck, unquote, you know, for these repetitive injuries. Well, here is a case where Ms. Woods claimed injuries at work in 1994. She never claimed any other injuries. Her condition never really changed a whole lot. She'd get relief from injections. She'd come back. This starts in 95 and goes all the way to 2003 and beyond, 2003, effective Guy Fawkes Day, November 5th. She stopped working. It's on a continuum. She never reached MMI. And this is what the commission found. And now on a more central issue of Dr. Glasgow's causal connection opinion, she was asked, and she answered, with respect to the issue of whether Ms. Woods' symptoms stem back to the October 15th incident, I believe it's correct. Certainly her continued active use of the arm can re-aggravate her discomfort. However, her incident dating back to October of 1994 is a causative factor in her chronic elbow pain. She stated this again and again throughout her treatment and throughout her testimony. Dr. Koh, I believe, mentioned it as well. Epicondylitis, the symptoms wax and wane. We cited the International Harvester case. We cited the Peoria Motors case. The International Harvester case is virtually on point. There was another incident thereafter. After a work-related accident, similar to that is the Mendona Township case where the teacher was injured while working and then had a couple incidents after that. But the court and the commission has stated very effectively the law on that subject. And I will quote from the original commission decision, which is reiterated later in the more recent decision, that every natural consequence that flows from an injury that arose out of it in the course of a claimant's employment is compensable unless caused by an independent intervening accident that breaks the chain of causation between a work-related condition and an ensuing disability of injury. That other incidence, whether work-related or not, may have aggravated the claimant's condition as irrelevant, see International Harvester. Where the work injury itself causes a subsequent injury, the chain of causation is not broken. So this court has recognized repeatedly that when the claimant's condition is weakened by a work-related accident, a subsequent accident that aggravates the condition does not break the causal chain. And again, they cited Mendona Township again. So it's an unbroken chain. Can I ask a question? What does the act provide for if an injured employee does something that they're told not to do that makes their condition worse? Well, I would say on a hypothetical basis, this is hypothetical, this is not the case here, but if someone engages in injurious practice, then one can say one has brought about one's own demise. That's not the case here. Otherwise, when there are natural consequences from an injury such as here, those natural consequences are compensable. A very, very interesting sort of insight that we need to have. The reason I ask the question is I ask the question in relation to repetitive trauma cases. Because you have repetitive trauma cases and you now have an employee who's told your condition, whatever it may be, is caused by what you're doing at work. And that's what's causing this condition. And they go back to work and do it some more. So now the question becomes have they engaged in an injurious practice that they've been advised is causing them harm by continued working? We don't have a case on it, and it troubles me. It troubles me in line with Glasgow's opinion where she turns around and says that she thinks that the petitioner's going on and doing plumbing and pipe fitting caused a pattern of worsening of her behavior in relation to her elbow. And so, you know, I understand exactly what you're saying. And I believe that perhaps not as articulately as I would have liked to. This is the dilemma in repetitive trauma. Here we would have needed to have 53 employers in the case, 53. And, of course, the consequence of ruling for the respondent in this case is that my client gets no compensation then for not being able to work as a pipe fitter anymore for what happened originally at MJ Corboy. So it is a dilemma, but that's the dilemma that the commission has to parse out. Who's responsible for this? Ms. Woods claimed never to have any injury or insult. When they went in there the second time in 2004, they just found degeneration, as counsel mentioned. The condition had degenerated. Would she have been better off never having worked after, let's say, 1997? That's when the 19B proceeding was, when everything was found causally connected? With Dr. Lieber and Dr. Glasgow testifying at that time? Sure, perhaps, maybe. Speculatively, perhaps. Maybe she wouldn't have gotten much worse. Maybe she wouldn't have needed another surgery in 2004. Difficult to say. But she would have had to have changed employment then, for sure. So the result really isn't any different. So while I agree that, you know, from a conceptual standpoint, we have some difficulty here. We need to change the act to give the respondent the kind of relief, in all respondents, the kind of relief they would want. In other words, the last employer is responsible. But here it's kind of difficult because the last employers, and all these different employers, 50-something of them, would all have a CISPRO defense. Her condition was so bad because her condition was waxing and waning. Just because it happened to become symptomatic while she was with us, now we have to pick up the ball? In other words, are we going to keep transferring the ball in one of these, like, last second plays in a football game? We keep lateraling the ball back to whoever is behind us? That's difficult from an administrative perspective. And, again, we don't have an OD act for repetitive traumas, in other words. I think that could create as many problems as it might solve. Because in some cases, I think after 2001, the alleged MMI date, she worked for 21 employers. She may never have worked for any particular employer long enough to qualify under the OD act because you have to have a certain amount of tenure of employment. So I don't know if that's the answer. But I think that's what the respondent is asking you all to do, to by judicial fiat impose some kind of OD act on us for the last, you know, the last employer has to pick it up. It's very difficult in a case like that to do that because there are so many employers. So we're back to where we were at the start. It's impossible for anybody that works out of a union home. It's just, again, we have 53 employers after Corboy in this case, 23 after 2001 January, and I think 45 after the 19B hearing in 97. So, administratively, that's a little unwieldy. And, again, the petitioner, you know, she would get these injections, she'd come back. The doctors would say, you know, you ought to think about doing something different. But, you know, pipe fitting is good work. And she wanted to continue her career. But such as it is, if she had chose something else, she would have wound up in the same position she is now. And, by the way, Your Honor, just for whatever this is worth, you know, our rates are capped. You know, when you choose an accident date, until the recent change in the act in 2005, our rates are capped by the PPD rate. Gee, it would be nice to choose a later accident date where the maximum PPD rates that one can get with tradesmen, you can get the rate up higher. The petitioner didn't seek to do that. I've never done the math. I haven't looked at that part of it. But on a speculative basis, yeah, that would work out nice for the petitioner because maybe her wage loss rate could be higher. But it's not. So I would have to say in this particular case, there certainly was no injurious practice. No doctor ever told the petitioner to stop working or you're going to make yourself worse. You know, they indicated that maybe you should try to maybe look into another line of work. This is what doctors do with their patients. But her condition was such that, after all, you use your elbows to wash dishes, go to the grocery store, et cetera. There is no way that we can speculate on what the condition of her arm would have been after 1997 had she not gone back to that work. So, again, this is the dilemma the commission had to sort out. I think they sorted it out. Overwhelmingly, the evidence shows a causal connection between petitioner's condition of ill-being in 2006, the condition of ill-being that required her to change professions, and the process that started in 1994. It's unbroken, an unbroken chain, except for three little words, which I think did not break the chain. Thank you. Council, rebuttal. First, addressing what Council said, Dr. Leakis once again never said she is not an MMI. Dr. Leakis recommended more care, and Dr. Leakis did say that by continuing to work, her condition was becoming more severe and her symptoms were worsening. It sounds like, from what Council said, no doctors are disagreeing with that. The next issue is if the court was to find that January 23, 2001 is the appropriate MMI date, as you said, Justice Hoffman, then the issue becomes does the repetitive trauma afterwards, does that cut the petitioner off from MJ Corboy's liability? I went through the cases International Harvester, Imperial Motors, and both those Imperial Motors, the Supreme Court noted that when the petitioner was working for the second employer, there was no aggravating condition going on at that time, so all the liability was on the first employer. In our case, obviously, the opposite can be said here. With International Harvester, 1961 was the accident, the petitioner returned to work. In 1965, there was the unrelated accident. In that case, the court noted that the doctors acknowledged that when the petitioner returned to work, the petitioner should never have returned to work. That was their mistake, and that the first surgery wasn't even the appropriate surgery. They did a laminectomy, and they said a fusion should be done. So I think those are the differences between our case and those cases. I do have no binding case authority for this court on whether repetitive trauma after an MMI date constitutes a new injury with respect to Illinois Workers' Compensation Law. As you know, I was only able to cite persuasive authority from the Florida Appellate Court, and that's all I would have as persuasive authority. I have nothing binding to compel you one way or the other on this, assuming you agree that January of 2001 is the MMI date for this instance. And based on the fact that January 23, 2001 is the MMI date, based on all the factors, it wasn't just an utterance from Dr. Stephen Glasgow. Dr. M. Glasgow confirmed it. The other treating physicians, Leakes, they never disagreed with that position. I think it was just more than one utterance from one doctor that her condition stabilized. She worked full duty almost three and a half years before that opinion was even rendered, so the doctors didn't just put her at MMI when she returned to work. And I know return to work, as the court has stated, is not just because you return to work doesn't mean you are at MMI. And so I feel that based on the facts of this case, the only conclusion that can be supported is that January 23, 2001 is the MMI date in this matter. And, Justice Hoffman, as you said, medical benefits, unless there's a new injury, you can still owe medical help with the fact. But if you find January 23, 2001 to be the MMI date, then the TTD of benefits awarded from December of 2003 through February 28 of 2005 should be reversed by this court, if that's your finding. Thank you, counsel. Thank you.